## The Wisconsin.[1]

### (*Circuit Court, E. D. New York.* July 14, 1885.)

COLLISION—STEAMER AND BARK—MISTAKE AS TO LIGHTS—FLARE-UP—BLUE LIGHT—PILOT SIGNAL.

The decision of the district court in the same case (23 Fed. Rep. 831) affirmed.

In Admiralty.

In these two actions against the steam-ship Wisconsin, which were argued together, the court (BLATCHFORD, Justice) made and filed the following findings of fact:

(1) A little after 1 o'clock on the morning of December 14, 1882, a collision took place between the bark Ella, belonging to the mercantile marine of the United States, and the British steam-ship Wisconsin, in latitude 40 deg. 40 min. N., and longitude 68 deg. 40 min. W., the steam-ship being bound from Liverpool to New York and the bark from Buenos Ayres to Boston, with cargo, in consequence of which the bark was injured on her starboard bow, and her cargo was damaged. The bark was close-hauled on her port tack, on a course N. N. W., the wind being W. or W. by N., and had set reefed foresail, foretop-mast-stay sail, maintop-mast-stay sail, and reefed spanker. The wind was blowing strong, and the night, though dark, was clear, and a good night for seeing lights at a distance. The bark was making between two and one-half and three knots an hour. She was of 654 tons burden, and was owned by the libelants in the first suit. She was about 145 feet long.

(2) The steam-ship was of 2,386 register tons burden. 400 feet long, was loaded by the stern, had about 15 feet free-board amid-ships, and was about 18 feet out of water at her stem. Her bridge was located about 130 feet aft of her extreme bow. She had two lookouts on the bridge, who were competent and experienced seamen, and each of them was carefully attending to such duty, and had no other duty to attend to. The second and fourth officers were also on the bridge. It was the second officer's watch, and he was in charge of the navigation of the steam-ship. Both of those officers were keeping a careful watch and lookout. There was no lookout on the bow. Only one of the lookouts has been called as a witness or accounted for. The steam-ship, before sighting any light on the bark, was moving at the rate of 11 knots an hour, and was on a compass course of W. by N. $\frac{1}{2}$ N., which was

[1] Reported by R. D. & Wyllys Benedict, of the New York bar.

a true course of W. She could be stopped from full speed ahead to dead in the water in three or four times her own length. Her half speed was about nine miles an hour. Her slow speed was about seven knots an hour.

(3) The steam-ship was upon the cruising ground of Sandy Hook pilots, and the master desired as soon as practicable to obtain the services of such a pilot, and the officers on deck were carefully looking out for a pilot's signal. By rule 11, § 4233, Rev. St., it was provided as follows at the time of said collision: "Sailing pilot vessels shall not carry the lights required for other sailing vessels, but shall carry a white light at the mast-head, visible all around the horizon, and shall also exhibit a flare-up light every fifteen minutes." The same provision of law was, at the time, in force by British authority in regard to British vessels.

(4) The white mast-head light of the steam-ship was made by the bark a little forward of her starboard beam, and about five or six miles distant, about half an hour before the collision happened. After the steam-ship's said light was first seen, it was constantly watched by those on the bark. About 15 minutes later, the master, the first mate, and four seamen being on deck, the red light of the steam-ship was made out from three to four miles distant, and thereupon a flare-up light was burned upon the bark, on her starboard quarter, which was seen by those on the steam-ship, bearing about two points forward of the port beam of the steam-ship. The second officer of the steam-ship examined this light with his glasses, and thought it was on a pilot-boat, which was headed about N., on the wind, and sent the fourth officer to call the captain. The captain went immediately upon the bridge, and it was announced to him that the flare-up light of a pilot-boat had been seen, and the direction it bore from the steam-ship was stated, and under his orders a blue light was burned on the steam-ship, as an answering signal to a pilot-boat, which is the only boat to which such a signal is given; and the blue light was seen by those on the bark, and it was promptly answered by her by another flare-up light, thus confirming those on the steamer in the judgment they had formed, that the approaching vessel was a pilot-boat. The watch below of the steam-ship was then called on deck, and they got a ladder ready to put over the side of the steamer to receive the supposed pilot when he should come along-side, and thus all the watch were on deck carefully watching the bark. A white light was also seen on the approaching vessel by those on the steam-ship, and was taken by them to be the white light at the mast-head of a pilot-boat, and the helm of the steam-ship was put to starboard, and she bore away for the approaching vessel, changing her heading from W. by N. ½ N. to S. W. ½ W. Her previous course was such that if it had been continued she would have passed the bark about four miles to the northward.

(5) When the steam-ship was at a safe distance from the bark, her engines were stopped, and her headway was substantially overcome, waiting for the pilot to come along-side in his boat.

(6) Afterwards, and when the two vessels were within a short distance of each other, a dim green light on the bark was, for the first time, seen by those on the steam-ship. It was seen through glasses, and sooner than it could have been seen by a lookout on the bow, and as soon as it could have been seen by any one on the steam-ship. It was an improper and insufficient light to be used as a signal light upon a vessel at sea. The engines of the steam-ship were at once backed strong, and she had, at the time of the collision, little, if any, headway. As the bark forged ahead across the bows of the steam-ship, the starboard bow of the bark came in contact with the stem of the steam-ship.

And the court also made and filed the following conclusions of law:

(1) The steam-ship was guilty of no fault.

(2) The bark was in fault for not having a proper and sufficient green light.

(3) The bark was also in fault for showing a flare-up light after seeing the

blue light burned on the steam-ship, and thus leading the steam-ship to suppose that the bark was a pilot-boat.

(4) The libel in the first case must be dismissed, with costs to the libelants in the district court, taxed at $335.50, and costs in this court, to be taxed; and the libel in the second case must be dismissed, with costs to the libelants in the district court, taxed at $335.50, and costs in this court, to be taxed.

*Scudder & Carter* and *Owen & Gray*, for libelants and appellants.

*Wilcox, Adams & Macklin*, for claimants and appellees.

Accompanying the foregoing findings was the following opinion:

BLATCHFORD, Justice. Concurring fully in the opinion of the district judge in these cases, (23 Fed. Rep. 831,) I can add nothing to what he has there so well said.